Receipt number 9998-3736311

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 13 2017
U.S. COURT OF
FEDERAL CLAIMS

UNITED AFFILIATES CORPORATION AND MINGO LOGAN COAL LLC )
)
Plaintiffs, )
)
v. ) Civ. No.: 17-67 L
)
UNITED STATES OF AMERICA, )
)
Defendant. )

**COMPLAINT**

United Affiliates Corporation ("United") and Mingo Logan Coal LLC ("Mingo Logan"), file this complaint against the United States of America ("United States") seeking relief under the Fifth Amendment of the United States Constitution for an unconstitutional taking of their property without just compensation.

## I. INTRODUCTION

1. United owns the land and most of the coal that can be mined in the area of West Virginia known as Spruce No. 1, which is operated by Mingo Logan pursuant to a long-term lease agreement. As part of that lease agreement, United is entitled to the payment of ongoing royalties from Mingo Logan based on the amount of coal mined from the property.

2. In 2007, the U.S. Army Corps of Engineers ("Corps") granted a permit under § 404 of the Clean Water Act allowing certain mining and disposal operations for Spruce No. 1. The issuance of the permit was the culmination of a 10-year application process, which included a 1600-page environmental impact study conducted by the federal government, a settlement of private litigation brought by numerous environmental plaintiffs, and an express decision by the EPA not to exercise its veto authority.

3. Just a few short years later, however, the EPA abruptly reversed course: Under the direction of a new presidential administration, the agency adopted a radical and unprecedented new policy with respect to coal-based energy, which included a drastically more restrictive approach to coal mining, including so-called Mountain Top Removal Mining that had long been authorized by statute. Based on that new policy, in 2011, the EPA took the unprecedented step of revoking the § 404 permit—something the agency had *never* done in the 40-plus-year history of the Clean Water Act--by withdrawing the 404 permit specification of the (as yet unused) Pigeonroost and Oldhouse Branch disposal sites that accounted for approximately eighty-eight percent of the area the original permit allowed for so-called "valley fills." In taking this action, the EPA disregarded the objection of the Corps, which expressly "determined that no additional evaluation of the project's effects on the environment [was] warranted," and that the permit should "not be suspended, modified or revoked."

4. In overriding the determination of the Corps and revoking the § 404 permit, the EPA effectively shut down anticipated mining operations, terminated numerous planned jobs, and destroyed the right to mine (and the economic value of) the property in the manner that had been specifically authorized only four years before. In thus depriving United and Mingo Logan of the previously authorized economically beneficial use of their property, the EPA deprived United the value of its property, and inflicted numerous other economic harms on the Plaintiffs and their employees.

5. Mingo Logan sued the EPA under the Administrative Procedure Act ("APA"), arguing that the permit revocation exceeded the EPA's statutory authority under § 404(c) of the Clean Water Act. A federal district court agreed, noting that the agency had "never before invoked its 404(c) powers to review a permit that had been previously duly issued by the Corps,"

and holding that the statute does not authorize such revocation. *Mingo Logan Coal Co. Inc. v. EPA*, 850 F. Supp. 2d 133, 150–51 (D.D.C. 2012). Although that statutory holding was subsequently reversed on appeal, the appellate court did not consider any takings claims, which are required by law to be brought separately. *See Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013); *see also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016) (concluding over a dissent by Judge Kavanaugh that the permit revocation was not arbitrary and capricious, and that Mingo Logan had procedurally defaulted its primary argument that the "EPA entirely failed to consider" the "costs" that were "incurred in reliance on the permit").

6. Regardless of whether the EPA has statutory authority to revoke a § 404 permit, the revocation in this case was an unconstitutional taking of property without just compensation under the Fifth Amendment of the United States Constitution.

7. In issuing the permit in 2007, the federal government created a specific property right for Mingo Logan and United to engage in the authorized mining and disposal activities. That governmental action induced reasonable investments to engage in the authorized activities.

8. The EPA's subsequent decision to revoke the permit was based on a radical change in the agency's policy and the applicable legal standards that had been in place for multiple decades.

9. By revoking the permit in this manner based on an previously unused legal standard, the EPA disrupted the reasonable expectations of United and Mingo Logan, as well as those persons they had employed to work on the Spruce No. 1 project.

10. The EPA's permit revocation constituted a categorical taking because it completely eliminated the property right to engage in the authorized activities that had been specifically granted to United and Mingo Logan.

11. The permit revocation also constituted a regulatory taking. This revocation caused millions of dollars in damages and destroyed a significant portion of the value of the property in question. It also dramatically overturned the reasonable expectations of United and Mingo Logan, which the federal government itself had induced to reasonably rely on the grant of the permit. Finally, it forced United and Mingo Logan to bear the concentrated brunt of the costs of regulation without any consideration by the government of those costs.

## II. JURISDICTION AND VENUE

12. Because this action is a takings claim against the United States, this Court has jurisdiction under 28 U.S.C. § 1491, and this Court is the appropriate venue.

## III. PARTIES

13. United Affiliates Corporation is a wholly-owned subsidiary of The United Company. United Affiliates Corporation owns most of the coal affected by EPA's revocation of the permit described in paragraph 3.

14. Mingo Logan operates the Spruce No. 1 mine located in West Virginia and is the permittee of the permit revoked by EPA as described in paragraph 3. Mingo Logan is a subsidiary of Arch Coal, Inc., one of the largest coal companies in the United States.

15. The United States is named as a defendant for the unconstitutional taking of property from United and Mingo Logan without just compensation.

## IV. FACTUAL ALLEGATIONS

### A. Background

16. Coal mining is essential to both West Virginia's economy and the nation's economic security and well-being. In 2008, West Virginia's coal industry directly employed more than 20,000 people and paid $1.5 billion in wages. A significant percentage of the nation's power plants run on coal from West Virginia. Reclaimed land from mining is used for airports,

industrial parks, retail malls, recreation facilities, schools, correctional facilities, roads, campgrounds, and federal buildings.

17. Surface mining produces excess rock and dirt, called spoil or overburden. In West Virginia, much of that material is used to re-contour the mined area to its approximate original contour. Not all of the overburden can return to the excavation area, however, and the excess must be placed elsewhere.

18. In the mountainous terrain of West Virginia, the only feasible disposal location for excess overburden in most instances is in adjacent hollows. Those hollows may contain areas regulated under the Clean Water Act as "navigable waters" even if they carry water only in the form of runoff during or after rainstorms.

19. Consequently, surface mining operations in West Virginia typically require a permit from the Corps under § 404 of the Clean Water Act for the "discharge of dredged or fill material into the navigable waters at specified disposal sites" in order to dispose of excess overburden in channels that the Corps considers "navigable waters."

**B. United's Lease Agreement With Mingo Logan and The Spruce No. 1 Mine**

20. United and the predecessor in interest of Mingo Logan entered into a "Coal Lease Agreement" (the "Coal Lease") on March 31, 1992 that covers the mining of the Spruce No. 1 area.

21. As part of the negotiations of the Coal Lease, the lessee agreed to make an upfront payment of cash and stock and then pay "advance annual minimum royalties" per year for 20 years with the option for the lessee to recoup the advance royalty payments with tonnage royalties through 2016.

22. Once the advance minimum royalties are recouped or following expiration of the recoupment period (April 1, 2017), whichever first occurred, United is entitled to receive certain tonnage royalties under the lease.

**C. Mingo Logan's Application Under Nationwide Permit 21**

23. The permitting process for Spruce No. 1 began in March 1997 when a former affiliate of Mingo Logan, Hobet Mining Inc. ("Hobet Mining"), applied for authorization to conduct fill operations under the Corps's Nationwide Permit 21, issued pursuant to Clean Water Act § 404(e).

24. The Corps studied the proposal for two years and concluded in January 1999 that "[a]fter evaluation of the submitted information and consideration of the coordination of federal and state agencies, it has been determined that the revised mining plan along with the approved mitigation plan meets the requirements of Nationwide Permit Number 21." Under § 404(e) of the Clean Water Act, compliance with Nationwide Permit 21 meant that the proposed project would have only minimal impacts, individually and cumulatively, on the aquatic environment.

25. The EPA participated in that review and agreed with the Corps that authorization under Nationwide Permit 21 was proper. The EPA concluded: "In consideration of information in the record for this project, including site-specific data collected by EPA, we accept that the potential individual and cumulative adverse environmental impacts to waters of the United States associated with this proposal have been minimized to the extent possible while maintaining a viable project. . . . We concur that this proposal is consistent with Section 404(e) of the Clean Water Act and with Nationwide Permit 21."

26. Before the Corps could issue its final approval under Nationwide Permit 21, the United States District Court for the Southern District of West Virginia preliminarily enjoined the

approval because of programmatic challenges to Nationwide Permit 21. *Bragg v. Robertson,* 54 F. Supp. 2d 635 (S.D.W.Va. 1999).

27. The preliminary injunction did not address the Corps's determination that the Spruce No. 1 fill operations would have minimal individual and cumulative adverse effects. Nonetheless, in the wake of the injunction, the Corps withdrew its proffered authorization for the Spruce No. 1 project under Nationwide Permit 21.

**D. Mingo Logan's Application for an Individual Permit**

28. Hobet Mining then applied in 1999 for an individual permit for the Spruce No. 1 site pursuant to Clean Water Act § 404(a). Due to a company divestiture in 2005, Mingo Logan replaced Hobet Mining as the applicant during the review process.

29. Notwithstanding the two-year review of the Spruce No. 1 project that it had just completed, the Corps conducted a full *de novo* review of the individual permit application. That review lasted seven years, generated an administrative record that spans tens of thousands of pages and cost Mingo Logan millions of dollars.

30. Mingo Logan worked cooperatively with the Corps and the EPA during that multi-year review and, at the request of the Corps and the EPA, significantly decreased the proposed scale of its operation from what the agencies had approved under Nationwide Permit 21, from an initial proposal covering 3,113 acres, recovering virtually all of the site's accessible coal and yielding more than 264 million cubic yards of excess spoil, to a final proposal covering only 2,278 acres. The reduced-scale proposal limited Mingo Logan to recovery of only 75 percent of the site's total coal reserves and, significantly, reduced the excess spoil to less than half as much as the original proposal. It also reduced the acreage of affected waters of the United States by more than 30 percent, from more than 12 acres to 8.11 acres.

31. Mingo Logan also agreed to additional mitigation measures by altering the footprint of its operation to avoid disturbing streams that West Virginia designated for protected status. Mingo Logan also agreed to additional compensatory mitigation such as wetlands creation and stream enhancements in acreages well beyond what the EPA and the Corps had previously concluded were sufficient in connection with the Nationwide Permit 21 application.

32. The EPA participated in the review of Mingo Logan's individual permit application. As part of that review, the EPA commented on Mingo Logan's reports, analyses, and data and provided the Corps additional data bearing on the potential effects of Mingo Logan's proposed operations.

33. The West Virginia Department of Environmental Protection ("WVDEP") also participated in the permit process. Under § 401(a) of the Clean Water Act, no § 404 permit may be granted unless and until the affected state certifies that operations conducted under the permit will meet all state water quality requirements. In West Virginia, the WVDEP has the authority to issue or deny water quality certifications. After scrutinizing Mingo Logan's permit application in light of West Virginia's Water Quality Standards and a Cumulative Hydrologic Impact Assessment, the WVDEP granted its water quality certification for the Spruce No. 1 permit, conditioned on Mingo Logan fulfilling its Mitigation and Compensation Agreement.

34. In conjunction with its review of Mingo Logan's application, the Corps conducted a full environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA")—the only full EIS ever prepared for an individual surface mine in West Virginia. The EIS was comprehensive and exhaustive, and entailed thousands of hours of work by at least five state and federal agencies, including the EPA.

35. The Draft EIS, published in March 2006, included more than 1600 pages of summaries, reports, comments, exhibits, appendices, and conclusions about the proposed mine's potential impacts on mineral resources, groundwater, surface water, wetlands, soils, vegetation, fish, wildlife, cultural resources, air quality, recreation, the economy, noise, scenery, hazardous materials, public health, and environmental justice.

36. With regard to water quality, the Draft EIS concluded that "[O]verall, it would be anticipated that the Spruce No. 1 mine would only contribute minimally to cumulative impacts on surface water quality," and added that "a net gain of waters of the U.S., including wetlands, would occur as a result of past, present, and reasonably foreseeable future actions" at the Spruce No. 1 site.

37. The EPA commented on the Draft EIS in a letter dated June 16, 2006, and the Corps considered and addressed those comments in the Final EIS, which was released in September 2006. The Final EIS included 58 pages specifically addressing EPA's comments on the Draft EIS.

38. Following the Final EIS, the Corps and the EPA exchanged correspondence, culminating in a final letter from the Corps sending additional "information [to] satisf[y] your concerns" and requesting that the EPA send any final comments by the close of business on December 18, 2006. EPA did not send any additional comments.

39. If, as of December 2006, the EPA had unresolved concerns regarding the permit, EPA had several statutory means either to block the permit before the Corps issued it or to require additional review. EPA did not invoke any of those remedies.

40. During the permit review process, the EPA could have, but did not use, its authority under § 404(c) to prohibit, deny, or withdraw the disposal sites specified in the permit

application. The EPA could have, but did not use, § 404(q) of the Clean Water Act to "elevate" the proposed permit for further review. The EPA could have, but did not use, § 309 of the Clean Air Act to challenge the Corps's Final EIS by referring it to the President's Council on Environmental Quality.

41. Rather than invoking any of the pre-issuance statutory avenues provided by Congress, the EPA allowed the Corps to issue the permit. Instead, the EPA expressly indicated that it would not be asserting any objection to the permit.

**E. The Permit**

42. The Corps issued a permit to Mingo Logan in January 2007, allowing Mingo Logan to place dredged and fill material—namely, excess overburden—into 8.11 acres of waters of the United States.

43. Those 8.11 acres comprised 0.12 acres of wetland (an abandoned farm pond); 1.83 acres of ephemeral (storm runoff only) streams; 6.13 acres of intermittent (seasonal only) streams, and 0.034 acres of a perennial (permanently flowing) stream. The impact on the 0.034 acres of a perennial stream would have been temporary.

44. The permit required extensive on-site and off-site mitigation, including the creation or enhancement of more than 15 acres of perennial and intermittent streams and wetlands.

45. The re-vegetation plan required by the permit called for the planting of at least 400 trees and 100 shrubs per acre, along with monitoring to ensure an 80 percent survival rate after five years. During the monitoring period, the permittee was also required to seek out and remove invasive plant species that may encroach on the project area.

46. The permit additionally required Mingo Logan to perform environmental monitoring for a minimum of ten years after completion of the mitigation plans to ensure the effectiveness of the mitigation measures.

47. In issuing the permit, the Corps expressly found that the proposed project complied with the § 404(b)(l) Guidelines, regulations that the Corps and the EPA jointly developed to evaluate Clean Water Act § 404 permit applications. The Corps specifically found, among other things, that the project would not violate water quality standards and that it would not contribute to significant degradation of waters of the United States.

48. The Corps also found that the public interest weighed in favor of the permit.

**F. Reliance on the Permit by Mingo Logan**

49. After receiving its permit, Mingo Logan spent millions of dollars preparing the site and commencing operations.

**G. The New Administration and Its New Anti-Coal Policy**

50. In a marked departure from prior EPA practice, and, in hindsight, a preview of things to come with respect to the unconstitutional taking complained of here, the EPA initiated an extra-regulatory review process for CWA section 404 permits that had no basis in either the EPA's or the Corp's codified procedures. In January 2009, the EPA announced the creation of a new system of review for certain Clean Water Act ("CWA") Section 404 permits through a series of memoranda and letters. See Multi-Criteria Integrated Resource Assessment ("MCIR Assessment") and Enhanced Coordination Process ("EC Process").[1] EPA sought no public

---

[1] Memorandum of Understanding Among the U.S. Department of the Army, U.S. Department of the Interior, and U.S. Environmental Protection Agency Implementing the Interagency Action Plan on Appalachian Surface Coal Mining (June 11, 2009), (attached as Exhibit A); Letter from Lisa Jackson, Adm'r, EPA, to Terrence Salt, Acting Ass't Sec'y (Civil Works), Dep't of the Army (June 11, 2009), (attached as Exhibit B); Memorandum from Lisa Jackson, Adm'r, EPA, & Terrence Salt, Acting Ass't Sec'y (Civil Works), Dep't of the Army, to EPA Reg'l Adm'rs & U.S. Army Corps of Engineers Dist. Commanders, "Enhanced Surface Coal Mining Pending Permit Coordination Procedures" (June 11, 2009) (attached as Exhibit C).

participation prior to adopting the Guidance, choosing instead to announce these regulatory changes and burdens in a press statement, even though EPA recognized the tremendous potential negative impacts and economic burdens the Guidance would have on coal and other industries, proclaiming that "'no, or very few, valley . . . fills are going to meet this standard.'" David A. Fahrenthold, Environmental regulations to curtail mountaintop mining , Wash. Post, Apr. 2, 2010, available at http://washingtonpost.com/wpdyn/content/article/2010/04/01/AR2010040102312.html (quoting then EPA Administrator Lisa P. Jackson).

**H. The Corps's Refusal to Suspend the Permit**

51. On September 3, 2009, the EPA sent a letter to the Corps formally requesting that the Corps "use its discretionary authority provided by 33 C.F.R. § 325.7 to suspend, revoke, or modify" Mingo Logan's permit.

52. The Corps invited the WVDEP to comment on EPA's letter, and the WVDEP did so, strongly defending Mingo Logan's permit.

53. The WVDEP confirmed that Mingo Logan's permit met all water quality standards. It stated that the permit "for the Spruce no. 1 Mine (No. WV1017021), which most directly regulates water quality at this location, had been open to scrutiny by USEPA on at least three occasions previously. Each time . . . USEPA allowed permit approval. As this permit currently stands, the effluent limitations it established are in compliance with all applicable Total Maximum Daily Loads (TMDLs) and West Virginia's federally approved antidegradation policy." Letter from Scott Mandirola, Acting Director, WVDEP, to Colonel Robert Peterson, District Engineer, Corps, at 2 (Sept. 25, 2009) (attached as Exhibit D).

54. The WVDEP also expressed frustration with the EPA's sudden change of heart: "At some point, a project must be deemed to have been studied enough to meet NEPA's

requirements. *This is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry.* It has previously been through . . . twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies. In addition, it has been examined by the State permitting quality control panel comprised of representatives of the environmental community, the coal industry, the WVDEP and the federal Office of Surface Mining Reclamation and Enforcement." *Id.* at 3 (emphasis added).

55. The WVDEP's letter affirmed that it "undertakes regular reviews of its water quality standards and other rules to ensure appropriateness" and described the EPA's request that the Corps suspend the permit as a "retroactive, ad hoc departure[] from existing laws, rules, and guidelines." *Id.*

56. On September 30, 2009, the Corps refused the EPA's request to suspend Mingo Logan's permit. *See* Exhibit E.

57. In its decision, the Corps recited the five factors to be considered in suspending a permit under 33 C.F.R. § 325.7: "[T]he extent of the permittee's compliance with the terms of its permit; whether circumstances relating to the authorized activity have changed since the permit was issued; significant permit objections which were not earlier considered; revisions to law; and the extent to which permit suspension, revocation, or modification would adversely affect plans, investments and actions the permittee has reasonably taken in reliance on the permit." Exhibit E at 2.

58. The Corps found that none of those factors warranted suspension of Mingo Logan's permit and concluded Mingo Logan was in compliance with its permit. There had been no change in circumstances. All permit objections had been considered by the Corps during the

decade the permit application was under review and, in the case of the EPA's comments in particular, resolved. There had been no change in the law.

59. The Corps addressed the issues raised by the EPA in the EPA's September 3, 2009 letter, including fill minimization, water quality and conductivity, cumulative impacts, and compensatory mitigation, and determined that they did not warrant suspension. With regard to water quality issues, the Corps noted that "[I]n a letter dated 25 September 2009, the WVDEP stated the effluent limitations established in the Spruce No. 1 Mine NPDES permit are in compliance with all applicable TMDLs and West Virginia's federally approved anti-degradation policy. [We] have no expectation the disposal of fill material in waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water quality standards." Exhibit E at 3.

## I. EPA's Revocation of the Permit

60. Despite the Corps's determination that no grounds existed for suspending or revoking the permit, the EPA gave notice on March 26, 2010 that it intended to 'veto' Mingo Logan's permit. The notice identified § 404(c) of the Clean Water Act as the authority for the EPA's action.

61. The EPA's press release accompanying its March 26 notice affirmed that the "EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and *never for a previously permitted project.*" (Emphasis added).

62. On April 2, 2010, the EPA published its "Proposed Determination" to "veto" the Spruce No. 1 permit in the Federal Register. 75 Fed. Reg. 16788 (Apr. 2, 2010).

63. On January 13, 2011, the EPA published its Final Determination, which formally "withdr[ew] the specification of certain "disposal site[s]" that had previously been authorized "for the discharge of dredged or fill material for the purpose of construction, operation, and reclamation of the Spruce No. 1 Surface Mine." Final Determination of the Assistant

Administrator for Water Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, WV, 76 Fed. Reg. 3126, 3128 (Jan. 19, 2011).

### J. Damages Resulting From The Permit Revocation

64. As a result of the EPA's permit revocation, Mingo Logan was forced to cease virtually all mining operations on the Spruce No. 1 property. The Plaintiffs have been denied millions of dollars in economically beneficial or productive use or value of the property.

## V. CLAIMS FOR RELIEF

### A. COUNT 1: Categorical Taking Under the Fifth Amendment of the United States Constitution

65. Mingo Logan and United repeat and re-allege all previous paragraphs of this Complaint as if fully set forth herein.

66. The Fifth Amendment provides that private property cannot "be taken for public use without just compensation." U.S. Constitution Amendment V

67. The EPA's revocation of the permit constituted a categorical taking under *Kaiser Aetna v. United States*, 444 U.S. 164 (1979).

68. *Kaiser Aetna* sets forth a categorical rule that when the government specifically authorizes a particular use of property that induces significant reliance in the form of financial investments, the property owner acquires a right to use the property in the authorized manner, unless the permit is revoked based on stable legal rules that were well understood when the permit was issued.

69. In this case, the federal government authorized a particular use of United's property by granting a § 404 permit allowing certain mining and disposal operations, which induced millions of dollars in investments from Mingo Logan. In granting the permit, the

government thus created significant "expectancies embodied in the concept of 'property,'" which it "must condemn and pay for" if it seeks to revoke the permit. *Id.* at 179.

70. The EPA's subsequent revocation of the permit was not justified based on any legal rules that existed at the time the permit was granted. Instead, the EPA revoked the permit based on a dramatic change in governmental policy and a radical shift in legal standards, which could not reasonably have been anticipated by United or Mingo Logan.

71. By thus depriving United and Mingo Logan of the right to use their property as specifically authorized by the permit, the EPA's revocation of the permit was an unconstitutional taking of property that requires the payment of just compensation.

### B. COUNT II: Regulatory Taking Under the Fifth Amendment of the United States Constitution

72. Mingo Logan and United repeat and re-allege all previous paragraphs of this Complaint as if fully set forth herein.

73. The EPA's revocation of the permit also constituted a regulatory taking based on (1) the "economic impact" on United and Mingo Logan (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124(1978)

74. On the first factor, the EPA's permit revocation had a substantial economic impact on United and Mingo Logan by depriving them of tens of millions of dollars in economically beneficial or productive use or value of the property.

75. On the second factor, the revocation of the permit dramatically interfered with the parties' distinct investment-backed expectations, because Mingo Logan invested millions of dollars in preparing the site for mining, and the grant of the permit reasonably caused them to believe that they would be able to engage in the activities that the permit specifically authorized.

Never before in the history of the Clean Water Act had the EPA or any other agency revoked a § 404 permit after it was granted. Moreover, at the time the permit was granted, the policy and applicable legal standards applied by the EPA and other arms of the federal government gave no reason to believe that the permit would be revoked. Yet just four years later, the permit was revoked based on a dramatic change in the policy of the federal government, which has effectively adopted new legal standards to determine whether mining and disposal operations should be allowed under a § 404 permit.

76. On the third factor, the character of the EPA's action also supports a finding of a taking. The revocation of the permit was entirely unprecedented and was the product of the EPA's failure to consider the costs of its action. Moreover, this action "singles out" United and Mingo Logan "to bear a burden" that the rest of the public does not bear, namely, the revocation of a specific permit that induced them to invest with the expectation that they would be entitled to a certain economically beneficial use of their property. *See E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion).

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court:

(1) Declare the EPA's permit revocation to be an unconstitutional taking of private property without just compensation under the Fifth Amendment of the United States Constitution

(2) Award just compensation for the taking based on the diminution in the market value of the Spruce No. 1 property, the investment made in reliance on the permit, the loss in economically beneficial or productive use or value of the property, and all other damages imposed on Mingo Logan and United as a result of the permit revocation.

(3) Award United and Mingo Logan's attorney's fees and other costs; and

(4) Grant such further relief the Court deems appropriate.

Dated: January 13, 2017

Respectfully submitted,

/s/ Kevin P. Holewinski
Kevin P. Holewinski
Daniella A. Einik
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
kpholewinski@jonesday.com
deinik@jonesday.com
Tel: (202) 879-3939
Fax: (202) 6260-1700

Attorneys for United Affiliates Corporation

Robert M. Rolfe
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd St.
Richmond, Virginia 23219
rrolfe@hunton.com
gsibley@hunton.com
(804) 788-8262

Attorneys for Mingo Logan Coal LLC