## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed December 20, 2018)

|  |  |  |
|---|---|---|
| UNITED AFFILIATES CORPORATION AND MINGO LOGAN COAL LLC | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17-67 L |
| UNITED STATES OF AMERICA, | ) ) | Judge Thomas C. Wheeler |
| Defendant. | ) ) ) | |

## UNITED STATES' MOTION TO DISMISS AND SUPPORTING MEMORANDUM

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the United States moves to dismiss the Complaint.  Plaintiffs allege Fifth Amendment takings claims, asserting that the United States Environmental Protection Agency's ("EPA") lawful and authorized action to withdraw disposal sites for mining waste specified under a § 404 Clean Water Act permit frustrated their economic interests in a West Virginia coal mining operation.  But Plaintiffs do not allege that the EPA imposed any restrictions on the use of Plaintiffs' property.  Rather, Plaintiffs appear to assert that they hold compensable property interests in the § 404 permit itself — a theory barred by controlling law.  Accordingly, the Complaint fails to state a claim upon which relief may be granted.  A memorandum in support of this motion follows.

## **TABLE OF CONTENTS**

Introduction ............................................................................................................... 1

Factual and Procedural Background ......................................................................... 3

Applicable Legal Standards ....................................................................................... 5

Argument ................................................................................................................... 7

    I.   The Court Should Dismiss Plaintiffs' "Categorical Takings" Claim (Count I)............ 8

        A.     Plaintiffs Have No Compensable Property Interest in a § 404 Permit ....... 9

        B.     Plaintiffs' "Categorical Takings" Allegations Are Not Supported by the Supreme Court's Ruling in *Kaiser Aetna* ........................................... 12

    II.  The Court Should Dismiss Plaintiffs' Regulatory Takings Claim (Count II) ............ 14

Conclusion ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
   988 F.2d 1157 (Fed. Cir. 1993) ................................................................ 6

*Air Pegasus of D.C., Inc. v. United States*,
   424 F.3d 1206 (Fed. Cir. 2005) ..................................... 6, 7, 15, 17, 18, 19

*Almota Farmers Elevator Warehouse Co. v. United States*,
   409 U.S. 470 (1973) .................................................................................. 6

*Alves v. United States*,
   133 F.3d 1454 (Fed. Cir. 1998) ................................................................ 9

*American Pelagic Fishing Co. v. United States*,
   379 F.3d 1363 (Fed. Cir. 2004) ........................................... 2, 7, 9, 11, 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................. 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................. 6

*Cambridge v. United States*,
   558 F.3d 1331 (Fed. Cir. 2009) ................................................................ 6

*Campbell v. United States*,
   266 U.S. 368 (1924) ................................................................................ 15

*Conti v. United States*,
   291 F.3d 1334 (Fed. Cir. 2002) ........................................... 2, 7, 9, 10, 11

*Fla. Rock Indus., Inc. v. United States*,
   18 F.3d 1560 (Fed. Cir. 1994) ................................................................ 16

*Hearts Bluff Game Ranch Inc. v. United States*,
   669 F.3d 1326 (Fed. Cir. 2012) ......................................... 6, 12, 18, 19

*Kaiser-Aetna v. United States*,
   444 U.S. 164 (1979) ........................................................... 1, 2, 13, 14

*Kirby Forest Indus., Inc. v. United States*,
   467 U.S. 1 (1984) .................................................................................. 17

*Klein v. United States*,
   375 F.2d 825 (Ct. Cl. 1967) .................................................................. 15

*Loveladies Harbor, Inc. v. United States*,
   28 F.3d 1171 (Fed. Cir. 1994) ................................................................ 16

*Maritrans Inc. v. United States*,
   342 F.3d 1344 (Fed. Cir. 2003) ................................................................ 6

*Mingo Logan Coal Co. v. EPA* (*Mingo Logan III*),
   829 F.3d 710 (D.C. Cir. 2016) ....................................... 1, 4, 5, 10, 11, 12

*Mingo Logan Coal. Co. v. United States* (*Mingo Logan II*),
    70 F.Supp. 3d 151 (D.D.C. 2015).............................................................................. 4, 5

*Mingo Logan Coal Co. v. EPA* (*Mingo Logan I*),
    714 F.3d 608 (D.C. Cir. 2013)................................................................... 1, 5, 8, 9, 10

*Mitchell Arms, Inc. v. United States*,
    7 F.3d 212 (Fed. Cir. 1993) ......................................................................... 6, 18, 19, 20

*Morris Assocs. Inc. v. Priddy*,
    383 S.E.2d 770 (W. Va. 1989)............................................................................... 17

*O'Dell v. McKenzie*,
    145 S.E.2d 388 (W. Va. 1965)............................................................................... 17

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*,
    243 F.R.D. 253 (S.D. W. Va. 2007) ...................................................................... 4

*Penn Central Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)................................................................................. 1, 14, 16

*Pennsylvania Coal Co. v. Mahon*,
    260 U.S. 393 (1922)............................................................................................. 16

*United States v. Fuller*,
    409 U.S. 488 (1973).......................................................................................... 2, 10

*United States v. Miller*,
    317 U.S. 369 (1943)............................................................................................. 15

*United States v. Rands*,
    389 U.S. 121 (1967)............................................................................................. 10

*United States v. Willow River Co.*,
    324 U.S. 499 (1945)............................................................................................. 14

*Wyatt v. United States*,
    271 F.3d 1090 (Fed. Cir. 2001) ............................................................................ 6

*Yuba Natural Res., Inc. v. United States*,
    904 F.2d 1577 (Fed. Cir. 1990) ............................................................................ 15

**Statutes**

33 U.S.C. § 1344............................................................................................................ 4, 9

**Rules**

RCFC 9(i)........................................................................................................................ 6

RCFC 12(b)(6) ............................................................................................................. 5, 20

**Regulations**

33 C.F.R. § 325.7(a)...................................................................................................... 10

**Other Authorities**

http://www.wvcommerce.org/resources/landandwater/land_streams/default.aspx ..................... 15

# INTRODUCTION[1]

Plaintiffs United Affiliates Corporation ("United") and Mingo Logan Coal LLC ("Mingo Logan") allege a Fifth Amendment taking without just compensation arising from EPA action that affected Mingo Logan's rights under a § 404 Clean Water Act permit governing disposal of mining debris at the Spruce No. 1 mine in West Virginia.  Under its lawful statutory and regulatory authority, and after extensive environmental study and review, the United States Environmental Protection Agency ("EPA") acted in 2011 to withdraw the United States Army Corps of Engineers' ("Corps") earlier designation of certain streams as disposal areas for waste associated with the Spruce No. 1 mine.  *See Mingo Logan Coal Co. v. EPA* (*Mingo Logan III*), 829 F.3d 710, 713 (D.C. Cir. 2016).  Plaintiffs allege no exclusive state law property interest in these streams, and may use the streams as disposal sites only subject to discretionary state and federal permitting authority.  Nevertheless, Plaintiffs contend that the EPA's action constitutes a "regulatory taking" of their property under *Penn Central*,[2] arguing that EPA frustrated their investment expectations and caused them economic harm.  Compl., Count II (¶¶ 72-76).  Plaintiffs also claim a so-called "categorical taking," alleging that they hold compensatory property interests *in the § 404 permit itself*.  Compl., Count I (¶¶ 65-71) (citing *Kaiser-Aetna v. United States*, 444 U.S. 164 (1979)).  Plaintiffs argue that the EPA's action disturbed Plaintiffs'

---

[1] The factual material supporting the United States' Motion to Dismiss is drawn from the allegations in Plaintiffs' Complaint and from published opinions issued in parallel litigation regarding the same EPA action under § 404 of the Clean Water Act that Plaintiffs challenged unsuccessfully before the United States District Court for the District of Columbia and the D.C. Circuit.  *See* Compl. ¶ 5; *Mingo Logan Coal Co. v. EPA* (*Mingo Logan I*), 714 F.3d 608 (D.C. Cir. 2013).

[2] *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

expectation that they could use the Pigeonroost and Oldhouse Branch streams to dispose of mining waste as specified in the § 404 permit.

Plaintiffs fail to state a claim upon which relief may be granted because they fail to allege two critical elements of a valid takings claim. *First*, Plaintiffs do not allege any actual government interference with the real property they claim was affected in this case: Plaintiffs do not allege that the United States prevented them from extracting mineral deposits located on their property or interfered with their right to exclude the government or third parties from their property. They allege no physical invasion of their property, nor any action by the United States to constrain Plaintiffs in the development of their property within its boundaries. Instead, Plaintiffs focus their claims exclusively on the alleged economic impact of federal regulatory action that affects only Plaintiffs' ability to make destructive use of natural resources that Plaintiffs do not own.

*Second*, Plaintiffs do not allege a compensable property interest that would support a regulatory taking claim. Even accepting as true that Plaintiffs undertook investments in reliance upon using the disposal sites specified in the § 404 permit, the law does not recognize as compensable the property interest Plaintiffs assert as the basis for their claim, *i.e.,* "the right to use [] property as specifically authorized by [a government] permit." Compl., ¶ 71. Under controlling law, "no property rights are created in permits and licenses." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing *United States v. Fuller*, 409 U.S. 488, 493 (1973); *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). This case is nothing like the *Kaiser-Aetna* case Plaintiffs rely on, which involved government action to impose "an actual physical invasion" of the plaintiffs' property. 444 U.S. at 180. Rather, like the plaintiffs in *American Pelagic*, who alleged an interest in legally revocable

federal fishing permits, Plaintiffs here did not suffer the taking of a legally cognizable property interest when the EPA acted to protect streams that Plaintiffs hoped to use as disposal sites under their § 404 permit.

For these reasons, and for those set forth below, the United States moves the Court to dismiss Plaintiffs' claims with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff United Affiliates Corporation ("United") owns surface and mineral rights within the boundaries of the Spruce No. 1 mine in West Virginia.  Compl. ¶ 1.  Plaintiff Mingo Logan Coal LLC ("Mingo Logan") operates that mine.  *Id.*  Mingo Logan does not assert ownership over any real property at issue in the Complaint.  United asserts that it "owns the land and most of the coal that can be mined in the area of West Virginia known as Spruce No. 1."  *Id.*  But neither Plaintiff alleges that it owns the beds and banks of the Pigeonroost or Oldhouse Branch streams and their tributaries (collectively Pigeonroost Branch and Oldhouse Branch streams), nor does either Plaintiff allege what rights, riparian or otherwise, it holds under West Virginia state law with respect to those streams.  Plaintiffs do not allege that they hold a state law property right that, absent discretionary state and federal permits, would allow them to bury, obstruct, or contaminate the Pigeonroost or Oldhouse Branch streams with mining spoil.

In 2007, the Corps issued Mingo Logan a permit under § 404 of the Clean Water Act allowing disposal of mining spoil in connection with operations at the Spruce No. 1 mine.  Compl. ¶¶ 2, 41.  United Affiliates is not a permittee under this permit, and does not allege that it holds any rights under the permit.  The 2007 permit allowed Mingo Logan to bury 8.11 acres of waters of the United States, including the Pigeonroost and Oldhouse Branch streams.  Compl. ¶ 42.  The permit, by its terms, required Mingo Logan to conduct certain on-site and off-site mitigation,

including re-vegetation activities and work to create and enhance streams and wetlands.  Compl. ¶¶ 44-45.  Although the EPA expressed concerns regarding Plaintiffs' proposed disposal activities, it did not in 2007 exercise its authority under § 404(c) of the Clean Water Act (33 U.S.C. § 1344(c)) to deny prohibit, restrict or withdraw specification of waters as sites for disposal of Plaintiffs' mining spoil.  *Mingo Logan III*, 829 F.3d at 716.

Mingo Logan's § 404 permit was almost immediately challenged in court by environmental groups, which added the permit to ongoing litigation challenging other coal-mining permits.  *Mingo Logan III*, 829 F.3d at 716 (citing *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 243 F.R.D. 253, 255, 257 (S.D. W. Va. 2007)).  Pursuant to an agreement it reached with the environmental plaintiffs, Mingo Logan began operations at the Spruce Mine in 2007 but limited its disposal of spoil to a single valley fill in Seng Camp Creek and its tributaries.  The other two disposal sites — Pigeonroost Branch and Oldhouse Branch — remained unused.  *Id.* at 716.

Subsequently, the EPA expressed concerns regarding the permit, and requested that the Corps use its discretionary authority, as cited in the permit, to suspend, revoke or modify the permit based on new information and circumstances that it believed justified reconsideration of the permit.  *Id.* at 717.  The Corps declined to change or revoke the permit, so EPA intervened directly. Invoking its authority under § 404(c), the EPA published a Proposed Determination, proposing to withdraw the § 404 permit specification of the as-yet-unused Pigeonroost and Oldhouse Branch disposal sites.  *Id.*  After holding a public hearing and receiving more than 100 oral and more than 50,000 written comments, the EPA ultimately issued a Final Determination on January 13, 2011, withdrawing the specification of the two disposal sites.  *See Mingo Logan Coal. Co. v. United States* (*Mingo Logan II*), 70 F.Supp. 3d 151, 159 (D.D.C. 2015).  The EPA found that use of these streams as disposal sites for coal mine refuse would result in unacceptable adverse impacts,

4

concluding, among other things, that the affected streams are some of the last, rare and important high quality streams in the watershed, and that removing the Pigeonroost and Oldhouse Branch streams as sources of freshwater dilution and converting them to sources of pollution would increase water contamination and salinity. *Id.*

Plaintiff Mingo Logan filed a lawsuit challenging the EPA's action, first arguing, unsuccessfully, that EPA lacked statutory authority to exercise its § 404(c) powers after a § 404 permit is issued by the Corps. *Mingo Logan I*, 714 F.3d 608. Upholding the EPA's statutory authority, the D.C. Circuit remanded the case to the district court to evaluate the merits of Mingo Logan's Administrative Procedure Act challenge to the substance of EPA's regulatory action. *Id.* at 616. The district court found that the EPA's decision was "reasonable, supported by the record, and based on considerations within the agency's purview." *Mingo Logan II*, 70 F. Supp. 3d at 154. The D.C. Circuit affirmed that ruling. *Mingo Logan III*, 829 F.3d 710.

Plaintiffs' lawsuit here, filed six years after the EPA's January 13, 2011 action, seeks just compensation under the Fifth Amendment for an alleged "taking of private property." Compl. at 17 (VI. Relief Requested ¶ 1). Plaintiffs contend that the EPA's lawful regulatory action "eliminated the property right to engage in the authorized activities that had been specifically granted to United and Mingo Logan" under the terms of the permit as-issued in 2007. Compl. ¶ 10. Plaintiffs also allege that their property interests at the Spruce No. 1 mine have been diminished economically by the EPA's disposal site restrictions, Compl. ¶¶ 11, 64, 74, and that they suffered losses of investments allegedly made in reliance on the § 404 permit. Compl. at 17 (Relief Requested ¶ (2)).

## **APPLICABLE LEGAL STANDARDS**

RCFC 12(b)(6) authorizes a court to dismiss a claim when it cannot succeed as a matter

of law.  "The purpose of [Rule 12(b)(6)] is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail . . . ."  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993).  Although the court must accept as true a plaintiff's allegations of fact, it is not required to accept as correct the legal conclusions the plaintiff would draw from such facts.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and "'naked assertion[s] devoid of further factual enhancement'" do not suffice to state a cause of action and must be disregarded.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)); *accord Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

"In pleading a claim for just compensation under the Fifth Amendment of the United States Constitution, a party must identify the specific property interest alleged to have been taken by the United States."  RCFC 9(i).  "Only persons with a valid property interest at the time of the taking are entitled to compensation."  *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (citing *Almota Farmers Elevator Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973)).  If the claimant fails to allege the existence of a legally cognizable property interest, the court's task is at an end.  *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003).

Likewise, a valid takings claim requires allegations of actual government interference with a plaintiff's *own private property*, and not interference with "collateral interests" that affect the value of a plaintiff's property.  *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993).  A plaintiff alleging the "'taking of private property must, at a minimum, assert that *its* property interest was actually taken by the government action.'"  *Hearts Bluff Game Ranch Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (quoting *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1215 (Fed. Cir. 2005).  A "derivative injury" to a plaintiff's

property caused by government regulation of property not owned by the plaintiff is not a taking. *Air Pegasus*, 424 F.3d at 1216.

## **ARGUMENT**

Plaintiffs here allege a taking based upon the EPA's lawful action to prevent the disposal of mining waste into two streams:  the Pigeonroost and Oldhouse Branch streams.  Plaintiffs do not allege that they hold any state law property rights with respect to these streams — let alone the kind of exclusive rights that would allow them, absent federal permitting, to bury the streams in mining waste.  Rather, Plaintiffs style their claims as a "taking" of the use rights Mingo Logan held under the terms of a § 404 permit issued by the Corps in 2007.  Compl. ¶¶ 7, 10, 69-71. Because a § 404 permit is discretionary, revocable, subject to modification, and may change hands only subject to the Corps' continuing regulatory authority, these allegations do not make out a valid takings claim, and certainly do not support the "categorical takings" claim Plaintiffs allege in Count I of the Complaint.  *See American Pelagic*, 379 F.3d at 1363; *Conti v. U.S.,* 291 F.3d at 1342.

The Court should likewise dismiss Plaintiffs' *Penn Central* claim (Count II), which is not premised upon allegations of government interference with Plaintiffs' property.  Plaintiffs do not allege that regulatory action by the EPA authorizes a physical invasion of Plaintiffs' property, or prevents Plaintiffs from developing their property or from extracting the minerals that United owns and leases to Mingo Logan.  Instead, Plaintiffs contend that EPA took action that prevents Plaintiffs from using water resources Plaintiffs do not own in order to improve the economic value of their mineral rights.  In other words, Plaintiffs allege that EPA caused a "derivative injury" to their property by regulation of other non-Plaintiff property.  *See Air Pegasus*, 424 F.3d

at 1216.  Under straightforward principles of takings law, and under the Federal Circuit's rulings in *Mitchell Arms*, *Hearts Bluff* and *Air Pegasus*, Plaintiffs' allegations fail to state a claim.

## I.      The Court Should Dismiss Plaintiffs' "Categorical Takings" Claim (Count I)

Count I of the Complaint is premised explicitly upon an allegation that Plaintiffs held a compensable property interest in the § 404 permit issued by the Corps to Mingo Logan in 2007. Plaintiffs allege that "in issuing the permit in 2007, the federal government created a specific property right for Mingo Logan and United to engage in the authorized mining and disposal activities," and that the permit issuance "induced reasonable investments to engage in the authorized activities."  Compl. ¶ 7.  Plaintiffs allege that "by revoking the permit," "EPA disrupted the reasonable expectations of United and Mingo Logan," and that EPA's actions "constituted a categorical taking" because EPA "completely eliminated the property right to engage in the authorized activities that had been specifically granted to United and Mingo Logan."  Compl. ¶¶ 9-10.

As an initial matter, the facts alleged in these paragraphs of the Complaint – including the allegation that EPA "revoked" the § 404 permit, and "completely eliminated" the authorizations under the permit – are belied by admissions elsewhere in the Complaint.  Plaintiffs acknowledge, as they must, that EPA acted in 2011 not to "revoke" the permit, but to withdraw designation of the Pigeonroost and Oldhouse Branch streams as disposal sites, while allowing the use of a third, previously approved disposal site.  *See* Compl. ¶ 63 (acknowledging that EPA's "Final Determination . . . formally withdrew the specification of certain disposal sites that had previously been authorized for the discharge of dredged or fill material") (internal citation omitted); *Mingo Logan I*, 714 F.3d at 610-611 (reciting EPA's decision to withdraw specification of two of three previously permitted disposal sites).  Plaintiffs also admit that EPA

did not "completely eliminate" the authorizations for disposal of dredge and fill material authorized under the permit, Compl. ¶ 10, alleging elsewhere that the "Pigeonroost and Oldhouse Branch disposal sites . . . accounted for approximately eight-eight percent of the area the original permit allowed for . . . 'valley fills.'"  Compl. ¶ 3.  And contrary to the Plaintiffs' allegations, the EPA did not diverge from "applicable legal standards" in exercising its § 404(c) authority.  *See* Compl. ¶ 8.  Rather, a D.C. Circuit panel unanimously rejected Mingo Logan's claim challenging the EPA's statutory powers, finding that the Clean Water Act's plain language "imposes no temporal limit on the [EPA] Administrator's authority to withdraw the Corps's specification" of disposal sites, and "instead expressly empowers him to prohibit, restrict or withdraw the specification '*whenever*' he makes a determination that the statutory 'unacceptable adverse effect' will result."  *Mingo Logan*, 714 F.3d at 613 (citing 33 U.S.C. § 1344(c)).  Thus, under the well-pleaded facts in the Complaint, EPA acted to withdraw specification of some of the disposal sites for mining waste specified under a § 404 permit, and held the power to do so at all times.

But even accepting for purposes of this motion the Complaints' characterization that EPA "revoked" Mingo Logan's permit rights, Plaintiffs fail to state a claim for a "categorical taking" or a taking of any kind, because Plaintiffs fail to allege the existence of a compensable property interest.

### A.       Plaintiffs Have No Compensable Property Interest in a § 404 Permit

The Federal Circuit has made clear in several rulings that government licenses and permits are not compensable property interests protected by the Takings Clause.  *See American Pelagic*, 379 F.3d at 1373-74; *Conti*, 291 F.3d at 1342; *Alves v. United States*, 133 F.3d 1454, 1457 (Fed. Cir. 1998).  That conclusion proceeds from the understanding that permits lack the

crucial indicia of property rights. *Conti*, 291 F.3d at 1342. Permits, like the § 404 Clean Water Act permit here, are not permanent regulatory guarantees, and the permit-issuing body, in this case, the Corps, retains the power to suspend, modify or revoke such permits. *Mingo Logan III*, 829 F.3d at 714 ("Once the Corps has issued a 404 permit, it retains discretion to "modify, suspend or revoke" it) (quoting 33 C.F.R. § 325.7(a)). Furthermore, a § 404 permit holder remains subject to the EPA's power to prohibit, restrict or withdraw a specified disposal site at any time. *See Mingo Logan I*, 714 F.3d at 612-13 (citing 33 U.S.C. § 1344(c)) ("the Congress made plain its intent to grant the [EPA] Administrator authority to prohibit/deny/restrict/ withdraw a specification [of a disposal site in a § 404 permit] at *any* time."). Thus, a § 404 permit is in no sense "private property" but instead holds the character of a use right that the Government can grant or withhold as it chooses. The Fifth Amendment does not require just compensation for the value the Government itself creates, and a contrary rule "would . . . create private claims in the public domain." *United States v. Fuller*, 409 U.S. 488, 494 (1973) (quoting *United States v. Rands*, 389 U.S. 121, 125 (1967)) (refusing to allow just compensation for the value added to a parcel of land by federal grazing permits the landowner held over adjacent lands). The Federal Circuit's rulings in *American Pelagic* and *Conti* are entirely dispositive of Plaintiffs' claim.

In *Conti*, the plaintiff held an Atlantic Ocean swordfishing permit and for many years used drift gillnet techniques to harvest swordfish. 291 F.3d at 1336. Following concerns that widespread use of drift gillnets was driving increases in marine mammal and sea turtle mortality, Congress passed legislation in 1999 to ban the technique, prohibiting the use of drift gillnet gear entirely in the Atlantic Swordfish Fishery. *Id.* at 1337. The plaintiff sued, alleging that the ban on harvesting swordfish using drift gillnets constituted a regulatory taking of his fishing permit.

*Id.*  As here, the plaintiff specifically alleged a compensable property interest in his federal use permit.  The Federal Circuit rejected this claim.  *Id.* at 1342.  Because the government retained the right to suspend, revoke, or modify the permit, the Federal Circuit concluded that "the permit bestowed a revocable license, instead of a property right."  *Id.*  As the Federal Circuit explained, the plaintiff's permit lacked "the crucial indicia of a property right."  *Id.*

In *American Pelagic*, the plaintiff secured federal fishing permits and a letter of authorization issued by the National Marine Fisheries Service ("NMFS") that granted the plaintiff permission to operate a commercial fishing vessel in the Exclusive Economic Zone ("EEZ") of the United States in the Atlantic Ocean.  379 F.3d at 1367-69.  In response to political opposition to the large scale of plaintiff's planned fishing operations, Congress passed legislation that effectively cancelled the plaintiff's existing permits and authorization letter, and at the same time prevented any further permits from being issued to its fishing vessel.  *Id.* at 1368.  The plaintiff sued for a taking, asserting that it had a property right in its fishery permits and authorizations that was taken by the legislation.  *Id.* at 1369.  The Federal Circuit built upon its earlier opinion in the *Conti* case, holding that, because the permit and authorization letter were not freely marketable, and because the Government retained the right to "sanction or deny the permits and authorization letter," "the plaintiff did not and could not possess a property interest in its fishery permits and authorization letter."  *Id.* at 1374.

Like the fishing permits in *American Pelagic* and *Conti*, the permittee here, Mingo Logan, held use rights subject not only to the Corps' authority to "modify, suspend or revoke the permit," but also subject to the EPA's authority to withdraw specification of disposal sites designated in the permit.  *See Mingo Logan III*, 829 F.3d at 714 (discussing the § 404 statutory scheme).  In fact, a D.C. Circuit panel unanimously rejected Plaintiffs' claim that the EPA lacked

statutory authority to withdraw a disposal site for mining waste after a § 404 permit is issued by

the Corps, holding that the plain language of the Clean Water Act placed within EPA's authority

the right to "deny," "restrict" or "withdraw" specification of a site for disposal of dredge-and-fill

material.  *Mingo Logan III*, 829 F.3d at 714.  Moreover, United has no possible compensable

property interest in the permit at all, because it is not a permittee under the permit, and therefore

has no standing to sue the United States in connection with the EPA's action as alleged in Count

I.

Because they hold no compensable interests in the § 404 permit, the Court should dismiss

Plaintiffs' "categorical takings" claims, which are premised exclusively upon the alleged

"taking" of Plaintiffs' "right[s] to use their property as specifically authorized by the permit."

Compl. ¶ 71.  "If the claimant fails to demonstrate the existence of a legally cognizable property

interest, the court's task is at an end."  *American Pelagic*, 379 F.3d at 1372; *Hearts Bluff*, 669.

F.3d 1326.

### B.  Plaintiffs' "Categorical Takings" Allegations Are Not Supported by the Supreme Court's Ruling in *Kaiser Aetna*

Plaintiffs analogize their claims to the one asserted in *Kaiser Aetna* and cite that case in

the Complaint.  *See* Compl. ¶¶ 67-68.  Plaintiffs contend that "*Kaiser Aetna* sets forth a

categorical rule that when the government specifically authorizes a particular use of property that

induces significant reliance in the form of financial investments, the property owner acquires a

right to use the property in the authorized manner, unless the permit is revoked based on stable

legal rules that were well understood when the permit was issued."  *Id.* ¶ 68.  But that is not the

holding of *Kaiser Aetna*, and the facts of that case are significantly different from those alleged

in the Complaint.

In *Kaiser Aetna*, the plaintiff was a property owner who developed a marina in Hawaii by dredging portions of a shallow lagoon that was considered private property under Hawaii law. The result of the development was to open the lagoon to an adjacent bay and the Pacific Ocean — effectively joining the lagoon with navigable waters of the United States.  444 U.S. at 177-180.  Once the project was completed, the Corps asserted regulatory authority over the marina under § 10 of the River and Harbors Appropriations Act of 1889, and informed the plaintiff that it was precluded from denying public access to the lagoon because it had become, by virtue of the plaintiff's efforts, a navigable water of the United States.  *Id.* at 387.  The plaintiffs argued that requiring public access to the lagoon was a taking for which the United States was required to pay just compensation under the Fifth Amendment.  *Id.*  The Court focused its analysis on the fact that prior to dredging, the lagoon had "always been considered to be private property under Hawaiian law," and explained that the plaintiffs' "right to exclude" others from the lagoon is "so universally held to be a fundamental element of the property right . . . the Government cannot take [it] without compensation."  *Id*. at 393.

Plaintiffs construe this case to set a "categorical rule" regarding a landowner's financial "reliance" interests in a federal regulatory permit.  But the plaintiffs in the *Kaiser Aetna* case apparently undertook their dredging project *without a permit*, *see Kaiser Aetna*, 444 U.S. at 386 ("the Corps advised them they were not required to obtain permits for the development of and operations in Kuapa Pond"), and the plaintiffs certainly *did not assert a compensable property interest in rights granted by a permit*.  To the contrary, the plaintiffs objected to the proposed taking of its "right to exclude" the public from its theretofore privately-owned lagoon once the project was finished.  It was because the plaintiffs sought to protect their interest in a fundamental property right — "the right to exclude" — that the Court found a taking:

13

> [N]ot all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion.

*Kaiser Aetna*, 444 U.S. at 178 (quoting *United States v. Willow River Co.*, 324 U.S. 499, 502

(1945).  Because the *Kaiser Aetna* plaintiffs' private ownership was based on a right which "has

the law back of it" — *i.e.*, the right to exclude third parties from its privately held lagoon — the

Corps was not permitted to impose an access easement upon the lagoon without paying just

compensation.

Plaintiffs' categorical takings claim does not allege any invasion of Plaintiffs' private

property, nor any infringement upon Plaintiffs' right to exclude.  Instead, Plaintiffs claim to have

suffered economic damages when the EPA withdrew federal use rights Plaintiffs obtained

through a § 404 permit.  As the Federal Circuit held in *American Pelagic* and *Conti*, these

economic interests are not "property rights," and the *Kaiser Aetna* case does not stand for a

contrary rule.

## II.      The Court Should Dismiss Plaintiffs' Regulatory Takings Claim (Count II)

In Count II of the Complaint, Plaintiffs allege a regulatory taking under the framework

set forth in *Penn Central*.  *See* Compl. ¶¶ 72-76.  Plaintiffs argue that the Court might find a

taking on the facts alleged in the Complaint by weighing the "economic impact on United and

Mingo Logan" of EPA's § 404(c) action, "the extent to which the [EPA's action] has interfered

with distinct investment-backed expectations," and "the character" of the EPA's action.  Compl.

¶ 73 (quoting *Penn Central*, 438 U.S. at 124).  What Plaintiffs leave out, however, and what they

fail to allege at all in the Complaint are facts supporting actual government interference with

their property.  In *Penn Central*, and in all cases in which plaintiffs have asserted cognizable

regulatory takings claims — including cases premised on § 404 permitting decisions — the

plaintiff has alleged that the government has invaded, destroyed or somehow constrained the use of private property that would otherwise be permitted under state law.  Plaintiffs make no such allegation here.  Instead, Plaintiffs allege that they suffered economic damages in reliance upon a federal permitting decision that would have allowed the Plaintiffs to use Pigeonroost and Oldhouse Branch streams as disposal sites — a right that Plaintiffs do not allege they hold under state law and could not exercise without state and federal regulatory permits.[3]  Plaintiffs fail to plead any regulatory restriction on real property rights that they in fact possessed.

A claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that *its* property interest was actually taken by the government action.  *Air Pegasus*, 424 F.3d at 1215.  Otherwise the takings clause would authorize government liability on claims for *consequential damages* brought by any plaintiff whose own property suffered no government interference but instead was simply made less valuable by government regulation.  That is not the law.  *See United States v. Miller*, 317 U.S. 369, 376 (1943) ("As respects other property of the owner consisting of separate tracts adjoining that affected by the taking, the Constitution has never been construed as requiring payment of consequential damages[.]"); *Campbell v. United States,* 266 U.S. 368, 371 (1924) ("[I]f the land taken from plaintiff had belonged to another, or if it had not been deemed part and parcel of his estate, he would not have been entitled to anything on account of the diminution in value of his estate. It is only because of the taking of a part of his land that he became entitled to any damages resulting to the rest."); *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law . . . that the

---

[3] The State of West Virginia asserts ownership over "the beds of West Virginia's 34,000 miles of rivers, creeks and streams" and requires permits for "major operations" in the State's streams. *See* http://www.wvcommerce.org/resources/landandwater/land_streams/default.aspx

measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."(citations omitted); *Klein v. United States*, 375 F.2d 825, 829 (Ct. Cl. 1967) ("It is settled law that . . . compensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost.").

*Penn Central*, for example, involved a regulatory takings claim by a property owner who was prevented by municipal regulatory action from building a taller structure within the footprint of its property. *See Penn Central*, 438 U.S. at 128-29. The earlier landmark case, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), involved state legislation that forbade surface and mineral rights owners from extracting coal on their own land under certain conditions. And in the specific context of § 404 permitting under the Clean Water Act, courts have held that the denial of a § 404 permit could amount to a taking of a cognizable property right under circumstances where the permit denial deprives the landowner of a right inherent in its land ownership — for example, where property owners are prevented from dredging and filling wetlands on their own property to build homes or develop their property in ways otherwise permissible under state law. *See, e.g.*, *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1175 (Fed. Cir. 1994) (denial of permit under § 404 that prevented development of wetlands for residential use was a taking); *Fla. Rock Indus., Inc. v. United States,* 18 F.3d 1560 (Fed. Cir. 1994) (recognizing possible regulatory taking where denial of § 404 permit prevented surface and mineral owner from conducting limestone mining on its property).

Here, the § 404 permit at issue does not regulate Plaintiffs' property; it does not forbid extraction of United's minerals, and does not govern any operation proposed for disposal on

Plaintiffs' property.  Instead, the permit concerns whether Plaintiffs may dispose of waste material from mining operations in the Pigeonroost and Oldhouse Branch streams.  Plaintiffs do not allege that they own these streams.  And even if Plaintiffs possessed some form of riparian right owing to their ownership of surface lands abutting the streams — a fact that Plaintiffs also do not allege — Plaintiffs would not hold a West Virginia state law property right that would allow them to bury, obstruct, or contaminate the streams themselves.  Under West Virginia law, as in other common law riparian states, a "reasonable use" rule applies, and a riparian owner may make only such consumptive use of a stream as does not materially diminish the same rights of downstream riparian owners or impair public rights.  *See Morris Assocs. Inc. v. Priddy*, 383 S.E.2d 770 (W. Va. 1989).  And no owner may obstruct or divert the natural flow of a stream of water across his premises to injury of a riparian owner above or below.  *O'Dell v. McKenzie*, 145 S.E.2d 388 (W. Va. 1965).  Plaintiff's proposal to bury several acres of streams, as approved in the 2007 Corps permit, exceeds any possible conception of "reasonable use," would obstruct the streams, and is not a right Plaintiffs could possibly hold under background principles of state law.

What Plaintiffs' *Penn Central* claim amounts to, then, is a claim that Plaintiffs were denied special regulatory permission to export waste material away from their mountaintop coal mining operations on United's property in a particular way that Plaintiffs believed was most economically advantageous to the development of their mineral interests.  As the Supreme Court has explained, "impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking."  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984).  In other words, a "derivative injury" to a plaintiff's property caused by government regulation of property not owned by the plaintiff is not a taking.  *Air*

*Pegasus*, 424 F.3d at 1216.  As the Federal Circuit has held in several similar cases, Plaintiffs

allegations fail to state a claim.  *See Hearts Bluff*, 669 F.3d at 1330; *Air Pegasus*, 424 F.3d at

1216; *Mitchell Arms*, 7 F.3d at 217.

For example, in *Hearts Bluff*, the plaintiff purchased land hoping that it could be used as

a mitigation bank — *i.e.*, as an offset of preserved and restored wetlands used to compensate for

the environmental impact of more destructive land use that may be permitted under the Clean

Water Act.  669 F.3d at 1327.  Prior to purchasing the land, the plaintiffs sought and received

certain assurances from the Corps, which oversees the mitigation bank program operated in

conjunction with § 404 permitting, that the acreage in question could be used as mitigation bank.

*Id*.  After plaintiffs purchased the land, however, the state of Texas adopted a state water plan

that was inconsistent with the use of the plaintiffs' land as a mitigation bank, and on that basis

the Corps refused to authorize plaintiff's proposal to develop a mitigation bank.  *Id.*  Plaintiffs

alleged a regulatory taking premised on the Corps' action, and alleged that they suffered

economic damages in reliance on the Corps' earlier assurances.  *Id.*  The United States Court of

Federal Claims dismissed the case on the pleadings.  *Id*. at 1328.  In affirming that ruling, the

Federal Circuit explained:

> [Plaintiff] has not been disturbed in the use of its property. [Plaintiff] purchased
> land, not a mitigation bank instrument or mitigation bank credits.
> *       *       *
> . . . [W]e have rejected claims of a cognizable property interest in government
> programs where the government has discretionary authority to deny access to that
> program, where the alleged property is subject to pervasive government control, or
> where the property is entirely a product of government regulations.
> *       *       *
> . . . At its core, [Plaintiff] argues that it detrimentally relied on the promises and
> representations of the Corps. Such detrimental reliance, however, does not create a
> property right under takings law.

*Id.* at 1331-32.  Each of these points is true of Plaintiffs' claims here.  Plaintiffs have not been

disturbed in the use of their property; they have been denied the destructive use of natural

resources that Plaintiffs do not exclusively own or control, and as to which any rights Plaintiffs held were "subject to pervasive government control."  Here as in *Hearts Bluff*, 669 F.3d at 1332, Plaintiffs' alleged detrimental reliance on the § 404 permit in its 2007 form "does not create a property right under takings law."

*Air Pegasus* is also on point.  In that case, the plaintiff owned a heliport business in Washington, D.C. and leased the right to use certain property as a heliport and helicopter service center.  424 F.3d at 1208.  After the September 11, 2001 attacks, the Federal Aviation Administration ("FAA") banned the use of the Washington, D.C. airspace that had made the heliport business viable.  The plaintiff claimed a regulatory taking, alleging that "the economic value of its business and its leasehold . . . had been destroyed."  *Id.*  at 1210.  The Federal Circuit in that case sounded the same theme:  "[T]here is a significant difference between an injury to one's property interest and a *taking* of one's property interest[.]"  *Id*. at 1216.  The *Air Pegasus* plaintiff "basically allege[d] that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations . . ."  *Id.*  On those facts, the Federal Circuit concluded, though it was "no doubt injured by reason of the government's actions, [Plaintiff] has not alleged a taking of private property under the Fifth Amendment."  *Id.*  So too here.  The EPA's action regulates the use of Pigeonroost and Oldhouse Branch streams as mining waste disposal sites, and does not regulate the use of Plaintiffs' property.  The consequential damages, if any, from that regulation are not a taking.

The *Mitchell Arms* case stands for the same principle.  The plaintiffs there, a firearms importer whose federal permit to import and sell assault rifles was suspended and revoked by the Bureau of Alcohol, Tobacco and Firearms ("ATF"), did not state a claim for a regulatory taking.  7 F.3d at 217.  The Federal Circuit held:

> "The Fifth Amendment concerns itself solely with the 'property,' *i.e.*, with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership."  In revoking the permits, ATF withdrew its prior authorization for Mitchell to sell certain types of assault rifles in the United States.  Otherwise, Mitchell retained complete control over the rifles.  Mitchell could have done anything it wished with the rifles, except import them into the United States in their original configuration.  Put another way, ATF did not take the rifles.  Rather, it "took" from Mitchell the ability to realize an expectation in the ultimate market disposition of the rifles.  This "collateral interest" incident to Mitchell's ownership of the rifles is not property protected by the Fifth Amendment.

*Id.* (internal citation omitted).  This is precisely the situation at bar.  The EPA "took" no property from Plaintiffs but instead acted in a way that Plaintiff contends "took" from them the ability to realize an expectation in the ultimate market disposition of their coal; a collateral interest not protected by the Fifth Amendment.

## CONCLUSION

For the reasons stated above, the Complaint fails to state a claim upon which relief may be granted.  Accordingly, the United States moves the Court under RCFC 12(b)(6) to dismiss the Complaint with prejudice.

Respectfully submitted this 20th day of December, 2018,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division


_____/s/_____

JOSHUA P. WILSON
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 305-0482
Facsimile: (202) 305-0506
joshua.wilson@usdoj.gov

*Attorneys for the United States*